UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

AHMADREZA M. DOOSTDAR

Case No.: **18CR 488**

Magistrate Judge Maria Valdez
**UNDER SEAL**

### AFFIDAVIT IN REMOVAL PROCEEDING

I, JOHN P. FARLEY, personally appearing before United States Magistrate Judge Maria Valdez and being duly sworn on oath, state that as a federal law enforcement officer I have been informed that AHMADREZA M. DOOSTDAR has been charged by Complaint in the District of Columbia with the following criminal offense: conspiring to act as a foreign government agent without notification and to provide services to Iran without a license, in violation of violation of Title 18, United States Code, Sections 371 and 951, and Title 50, United States Code, Section 1701 *et seq.*

A copy of the Complaint is attached. A copy of the arrest warrant also is attached.

JOHN P. FARLEY
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 9th day of August, 2018.

MARIA VALDEZ
United States Magistrate Judge

# UNITED STATES DISTRICT COURT

for the

District of Columbia

United States of America
v.

Ahmadreza Mohammadi Doostdar

_____
*Defendant(s)*

)

Case: 1:18−mj−00087
Assigned To : Magistrate Judge Harvey, G. Michael
Assign. Date : 8/8/2018
Description: Criminal Complaint & Arrest

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 2017 to the present_____ in the county of _____ in the
_____ District of _____Columbia_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk
By _____
Deputy Clerk

This criminal complaint is based on these facts:

See attached Affidavit which is incorporated by reference as if fully stated herein

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mikel Wier, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____08/08/2018_____

_____
*Judge's signature*

City and state: _____Washington, D.C._____

Magistrate Judge G. Michael Harvey
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mikel Wier, being first duly sworn, state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately eight years.  I am currently assigned to the Washington Field Office to a squad responsible for investigating extraterritorial counterterrorism matters.  I began my career at the FBI in the counterterrorism section of the San Diego Field Office.  For approximately the last three years, I was assigned to the Critical Incident Response Group.  In May 2018, I was assigned to my current squad. Through the course of my duties, I have participated in numerous subject and witness interviews and reviewed electronic and other materials seized pursuant to search warrants in terrorism cases.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and information provided to me by other agents and law enforcement officials; and information otherwise obtained by credible and reliable sources. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

2.      This affidavit is being submitted in support of a criminal complaint alleging that Ahmadreza Mohammadi DOOSTDAR (DOOSTDAR), Majid GHORBANI (GHORBANI), and others known and unknown to the United States (collectively, "the defendants"), conspired to (1) willfully and knowingly act as agents of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, and (2) provide services to Iran, without having first obtained the required license from OFAC, as required by

law, in violation of Title 18, United States Code, Sections 371 and 951, and Title 50, United States Code, Sections 1701 *et seq.*

3.	This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, law enforcement records, court authorized searched, witness interviews, and my training and experience, as well as the training and experience of other law enforcement agents. When I provide in this affidavit direct quotations of statements made by DOOSTDAR or GHORBANI, they are often preliminary translations of statements that were made in the Farsi language.

4.	Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts that I believe are necessary to establish probable cause that the defendants violated Title 18, United States Code, Sections 371 and 951, and Title 50, United States Code, Sections 1701 *et seq.*

5.	From in or around March 2017, up to and including the present, in the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI acted in the United States as agents of a foreign power, to wit the Government of Iran, in order to conduct covert surveillance on and to collect information from and about the Mojahedin-e Khalq (MEK) and Israeli/Jewish groups, and to provide this information back to the Government of Iran for the purpose of enabling the Government of Iran to target these groups.

6.	Based on my training and experience, foreign intelligence services assemble "target packages" to enable an intelligence or military unit to find, fix, track and neutralize a threat. A human target package includes information collected about an individual, such as the official position of the individual; an analysis of personal vulnerabilities or other opportunities to

2

exploit the individual; and confirmation of the identity and location of the individual. Finally, a target package could enable a neutralization plan, which may include apprehension, recruitment, cyber exploitation, or capture/kill operations.

7. DOOSTDAR was born in Long Beach, California, on or about October 30, 1980; DOOSTDAR is a United States Citizen. DOOSTDAR left the United States in 1982 and moved to Canada and then to Tehran, Iran. DOOSTDAR has resided outside of the United States continuously since 1982, and prior to in or around 2017, DOOSTDAR had only visited the United States briefly on two occasions.

8. GHORBANI was born on or about September 23, 1959, and was raised in Iran. He first entered the United States in 1995. On or about May 28, 2015, GHORBANI became a Legal Permanent Resident of the United States. He has lived and worked in Costa Mesa, California, since he arrived in the United States.

9. The Government of Iran is a foreign power with which the United States has no formal diplomatic relations. The U.S. Secretary of State has named Iran a state sponsor of terrorism each year since 1984; Iran is one of only three foreign countries to be so designated.

10. The MEK, also referred to as the People's Mujahedin of Iran, was created by a group of individuals who opposed the 1979 Iranian Revolution.[1] Those individuals were exiled from Iran after the revolution, and they have continuously advocated for the overthrow of the current regime since that time. The National Council of Resistance of Iran (NCRI) was created in 1981 to act as a political front for the MEK. The Government of Iran considers the MEK to be a primary opponent of the current regime, and has sought to eradicate the MEK.

---

[1] MEK was designated by the United States Department of State as a Foreign Terrorist Organization between 1997 and 2012.

3

11.     The Government of Iran does not recognize Israel as a sovereign nation; it considers Israel, and its Jewish citizens, to be oppressing the people of Palestine.

12.     Hillel Houses and Chabad centers are examples of Jewish Centers within the United States.

13.     The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States, when the President declares a national emergency with respect to that threat.

14.     On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.

15.     Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

16.     The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulation, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560, implementing the sanctions required by the Executive Orders.

17.     Specifically, absent permission from OFAC in the form of a license, the ITSR prohibited the supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Iran or the Government of Iran (31 C.F.R. Part 560.204).

18.     "U.S. Person" is defined to include U.S. citizens, or permanent resident aliens, or individuals located within the United States. *See* 31 C.F.R. 560.314.

19.     The ITSR was in effect at all times relevant to this Complaint.

20.     At no time did DOOSTDAR or GHORBANI apply for a license from OFAC, which is located in the District of Columbia, to supply services, directly or indirectly, to Iran or the Government of Iran.

21.     At no time did DOOSTDAR or GHORBANI notify the Attorney General of the United States, whose office in the Department of Justice is located in the District of Columbia, that they were acting as agents of the Government of Iran within the United States.

### Probable Cause

*DOOSTDAR's July 2017 Trip to the United States*

22.     According to a court-authorized search, DOOSTDAR began planning operational activity in the United States as early as in or around March 2017. On or about March 6 and 7, he

searched for multiple terms related to California, including repeated searches for maps of universities in California and events to attend in the Los Angeles area. On or about July 16, 2017, he searched for how much cash one could bring into the United States. On the same day, he began searching for terms related to Costa Mesa, California, including various halal and Middle Eastern restaurants located there, and directions to the Macy's Valet at South Coast Plaza in Costa Mesa.

23. On or about July 19, 2017, DOOSTDAR travelled from Tehran, Iran, to Chicago, Illinois. When he first entered the United States, DOOSTDAR was questioned by Customs and Border Protection (CBP) officers. He reported to CBP that he planned to stay in Chicago until approximately July 25, 2017. DOOSTDAR further stated that on or about July 25, 2017, he was going to travel to Los Angeles, California, to see the location where he was born. DOOSTDAR reported that he planned to leave Los Angeles on or about July 30, 2017.

24. According to FBI physical surveillance, on or about July 21, 2017, DOOSTDAR visited the Oriental Institute Museum at the University of Chicago. DOOSTDAR moved through the museum in an unusual fashion and was alone in a small room with an unidentified female for a short time. When the FBI physical surveillance team members entered the room, the woman was folding up a small piece of paper. After leaving the museum, DOOSTDAR walked about a block away and began taking photographs with a cellular device of several Jewish centers, specifically a Hillel Center and a Rohr Chabad Center. DOOSTDAR was seen photographing the front and back of the Rohr Chabad Center, as well as the wrought iron fence surrounding the building. DOOSTDAR also turned around to look at the building multiple times as he walked away.

25. From approximately July 25 through July 30, 2017, DOOSTDAR was in Costa Mesa, California, where he met several times with GHORBANI. DOOSTDAR employed intelligence tradecraft and ran surveillance detection routes before, during, and after his meetings with GHORBANI. I am able to recognize this tradecraft from my training and experience. Examples of tradecraft employed by DOOSTDAR include changing his clothes before each meeting, visiting meeting locations prior to the actual meeting, and arriving and departing from each meeting in a circuitous manner. FBI physical surveillance also noted that DOOSTDAR walked slowly and was constantly looking around his surroundings. He also appeared to look in cars and the reflection of store windows as he passed by, consistent with checking for surveillance.

26. FBI physical surveillance first observed DOOSTDAR in contact with GHORBANI on or about July 26, 2017, when DOOSTDAR left his Costa Mesa Airbnb apartment and walked to the vicinity of a Persian restaurant where GHORBANI works. FBI surveillance had noted that DOOSTDAR was near the Persian restaurant on the day before, shortly after arriving in the Costa Mesa area. DOOSTDAR was observed walking behind the restaurant, where he met with GHORBANI. When DOOSTDAR stepped away from GHORBANI, he had a white piece of paper that appeared to be a standard 8.5 x 11 size folded in half. He folded the paper and put it in his pocket. The FBI surveillance team noted that, based on the way they greeted each other, it appeared as if DOOSTDAR and GHORBANI were meeting for the first time.

27. After leaving the meeting, on or about July 26, 2017, DOOSTDAR began walking in the direction of his Airbnb apartment, but then turned around and walked approximately one mile in the opposite direction to a gas station. Based on my training and

experience, this is consistent with conducting surveillance and counter-surveillance of the location where he would later meet GHORBANI. DOOSTDAR bought a drink, crossed the street, and began walking up the block before turning around again to enter another gas station across the street from the first one. He bought a second drink and was later seen walking toward his Airbnb apartment.

28. On or about July 27, 2017, DOOSTDAR traveled to the first gas station he stopped at the night before. GHORBANI picked up DOOSTDAR and they sat outside a coffee shop and talked for about one hour. GHORBANI then drove DOOSTDAR back to his Airbnb apartment.

29. On or about July 29, 2017, FBI physical surveillance observed GHORBANI picking up DOOSTDAR at his Airbnb apartment. The pair drove to a market in Irvine, California. Initially, they drove past the market for several miles before turning around and returning to the market. They sat outside the market for a little less than one hour, when GHORBANI drove DOOSTDAR back to DOOSTDAR's Airbnb apartment. GHORBANI handed DOOSTDAR a Macy's bag when they arrived, which appeared new and full of unidentified items.

*DOOSTDAR's Pre-operational Planning*

30. DOOSTDAR began planning another trip to the United States in or around September 2017. According to a court-authorized search, DOOSTDAR began searching for terms related to California, to include various hotels and rental properties through Airbnb in Costa Mesa and Orange County, and "weather in costa mesa ca in December."

31. On or about September 19, 2017, from Iran, DOOSTDAR reserved an Airbnb in Costa Mesa, California, for December 9-13, 2017. DOOSTDAR also reserved airline tickets

from Tehran, Iran, to Chicago, Illinois, arriving on December 4, 2017; from Chicago, Illinois, to Los Angeles, California, arriving on December 9, 2017; and from Los Angeles, California, to Tehran, Iran, departing on December 13, 2017.

*GHORBANI's Surveillance of MEK in September 2017 in New York*

32.     GHORBANI traveled to New York City on or about September 19, 2017, and returned to California on or about September 20, 2017. As detailed below, during this trip, GHORBANI attended an MEK/NCRI rally in New York, New York, which denounced the Iranian regime. During this rally, GHORBANI conducted physical surveillance and photographed individuals participating in the rally.

*DOOSTDAR's December 2017 Travel to the United States*

33.     On or about December 4, 2017, DOOSTDAR arrived in Chicago, Illinois, from Tehran, Iran, via Frankfurt, Germany. During a court-authorized physical search, DOOSTDAR was found to be in possession of $6,000 cash, which he told CBP officers was to pay back his brother for all of his expenses. DOOSTDAR also had a notebook and two flash/USB drives, one of which was concealed in a toy on a key chain. DOOSTDAR underwent a secondary screening interview by CBP, and in that interview he said that he did not have any friends, family, or contacts in California that he visited during the July 2017 trip, nor did he have any friends, family or contacts in California that he was planning to see on the December 2017 trip.

34.     On or about December 9, 2017, DOOSTDAR traveled from Chicago, Illinois, to Costa Mesa, California. On December 10, 2017, DOOSTDAR was observed by FBI physical surveillance leaving his Costa Mesa-based Airbnb apartment at approximately 8:56 a.m. and walking to a pay phone outside the Macy's Men's Department at the South Coast Plaza Mall (as

described above, DOOSTDAR had searched for the location of this Macy's in July 2017 from Iran).

35.     On or about December 10, 2017, court-authorized electronic surveillance picked up a call from DOOSTDAR (using a payphone) to GHORBANI at approximately 9:53 a.m. DOOSTDAR identified himself as "Amir Mohajir." GHORBANI first stated he did not know who was calling; DOOSTDAR prompted him, saying "you are Uncle Sohrab!" This comment appeared to orient GHORBANI, and the two men agreed to meet at approximately 1:00 p.m. at the same place GHORBANI had previously dropped off DOOSTDAR.

36.     On or about December 10, 2017, at approximately 12:42 p.m., GHORBANI picked up DOOSTDAR from the street near the Airbnb apartment near where DOOSTDAR stayed during his July 2017 trip. DOOSTDAR sat in the rear passenger seat and the men were observed driving around the neighborhood, making numerous last-minute turns and U-turns, consistent with conducting counter-surveillance.

37.     Court-authorized electronic surveillance revealed that, during the car-ride, on or about December 10, 2017, GHORBANI described his trip to New York to attend the MEK rally, stating "I went to their meeting in New York…I saw no other option…you have to go, if you want to penetrate- you have to go…I went to their event and took a lot of photos." DOOSTDAR asked for this information and GHORBANI replied that it was not complete. GHORBANI went on to say "I took some pictures and collected some information of them and some senators that they worked with…. I have prepared a package, but it is not complete…"

38.     During the car ride, on or about December 10, 2017, DOOSTDAR asked GHORBANI to give him whatever he had collected to date. DOOSTDAR gave GHORBANI a "flash," likely a reference to a flash/USB drive, stating "they said, don't give us those things

printed, give us the file format, prints wear off after a while because we work and zoom in on those materials." DOOSTDAR instructed GHORBANI to "save it on this. I have something- personal photos and movies- saved on this, you save yours on this in scattered format- whatever you have, and if you wanted to explain anything- you can do that tomorrow…I noticed they don't search these at all, I put it right in front of them, they didn't even open it- upon departure is easier, when you leave, then they don't even bother you." GHORBANI replied that he just had "10-12 photos." DOOSTDAR said, "no problem, it is good enough for now…I will give it to the guys to do their research…these photos, it doesn't matter if it is a not a lot, just give me whatever you have [and] explain what those are." GHORBANI expressed some frustration, "I don't like it this way . . . I like to have a complete package, meaning that there is no gap in information."

39. During the car ride, on or about December 10, 2017, GHORBANI also described that he had learned how many agents the MEK had in Iran. He reported that he saw the individual who "leaked the nuclear program in 2001. . . with Jafarzadeh, who is the head of the NCR here -- with Safavi -- and the senator who these guys call him- I videotaped one of his speeches, with photos, motherfucker is [UI] working for Mossad now…he works for these people too…he gets paid; he is one of those motherfucking Jews…I swear; motherfucker needs one- one shot." DOOSTDAR laughed throughout this exchange.

40. During the same conversation, on or about December 10, 2017, DOOSTDAR and GHORBANI discussed how and when to meet again. GHORBANI asked if he could call DOOSTDAR back on the "same one that you called me from?" DOOSTDAR replied, "no, I call you from public phone…from Macy's public phone." DOOSTDAR said GHORBANI did not need to call him and that they would set up the next meeting "right now." GHORBANI then agreed to meet with DOOSTDAR for a longer period of time on Monday. GHORBANI also

11

informed DOOSTDAR that he would be traveling to Iran on March 31, 2018, to conduct an in-person briefing. DOOSTDAR confirmed the date for this meeting in Iran. DOOSTDAR cautioned GHORBANI not to try to call Iran directly because there was no way to set up a secure line, and he indicated that GHORBANI's prior attempt to call, which GHORBANI acknowledged, was a violation of protocol.

41.     According to FBI physical surveillance, after meeting with DOOSTDAR on or about December 10, 2017, GHORBANI went to a CVS store. Court-authorized electronic surveillance revealed that GHORBANI called a friend for assistance in transferring photos to the flash drive. FBI physical surveillance observed GHORBANI exit the CVS carrying an orange and white photo envelope. As discussed below, I believe that GHORBANI printed out at least some of the photos he took at the MEK rally in the CVS, and that those photos were contained in the orange and white photo envelope.

42.     FBI physical surveillance revealed that GHORBANI and DOOSTDAR met again on or about December 11, 2017. GHORBANI picked DOOSTDAR up from his Airbnb apartment, and DOOSTDAR sat in the back seat as he had done the day prior. During the ride, GHORBANI assured DOOSTDAR that his phone was off; DOOSTDAR nonetheless stated that they should wait until they got out of the car to talk, since phones could record "even if they are turned off – it is possible." They then met at a Starbucks coffee shop for approximately 45 minutes and sat in a secluded location. During the meeting, DOOSTDAR was observed taking notes as they talked. Upon leaving the meeting, DOOSTDAR was seen carrying what appeared to be the same orange and white photo envelope that GHORBANI had carried out of the CVS the previous day and the aforementioned USB drive contained in a toy on a key chain.

43.     On or about December 12, 2017, a court-authorized physical search at the Los Angeles International Airport before DOOSTDAR's outbound flight revealed in his carry-on luggage the notebook DOOSTDAR had been seen walking around with during his trip. The notebook contained what appeared to be a signed, hand-written payment receipt stating, "I, Uncle Sohrab, received $2,000." "Sohrab" is the alias used by GHORBANI, as noted above. The FBI also found approximately $2,400 in U.S. Currency. As previously noted, DOOSTDAR brought $6,000 into the country on or about December 4, 2017.

44.     On or about December 12, 2017, in DOOSTDAR's checked luggage, the FBI found hidden in the bottom of the suitcase, wrapped in a pair of boxer briefs, an orange and white photo envelope. The envelope contained 28 photographs of what appear to be a #FreeIran protest held in New York City on or about September 20, 2017. Some of the pictures are of GHORBANI standing next to select individuals at the rally, while others appear to have been taken more surreptitiously. Many of the photographs had hand-written notes on the back with names and positions of the individuals appearing in the photo. One of the individuals pictured was "Dr. Ahmad Rajavi, the brother of Massoud." The FBI also found a flash/USB drive concealed within a toy on a key chain hidden in a wallet in DOOSTDAR's checked luggage. I believe this was the flash/USB drive DOOSTDAR gave to GHORBANI in order for GHORBANI to save information to it. Based on my training and experience, I further believe that DOOSTDAR in turn provided this flash/USB drive to the Government of Iran.

*GHORBANI's Provision of MEK Information to the Government of Iran and Receipt of Future Surveillance Instructions*

45.     On or about March 14, 2018, during a court-authorized physical search of GHORBANI's apartment, the FBI found several hand-written notes in Farsi regarding members of the MEK, including names, positions, and relations to other MEK members. Some of the

13

notes referenced MEK/NCRI meetings that GHORBANI appears to have attended at the Persian restaurant, such as one on or about August 1, 2017, during which they discussed several topic areas to include sending three American senators to evaluate the organization's base in Albania, planning a demonstration in New York on September 20th in front of the United Nations at the time of Iranian President Hassan Rouhani's arrival, and reviewing Congress's decision regarding designating Islamic Revolutionary Guard Corps terrorists. GHORBANI had provided some of this information to DOOSTDAR during the July 2017 trip. The FBI also found in a locked suitcase a manila envelope containing information, including biographical data and phone numbers, about several U.S. Congressmen who have overt ties to the MEK.

46. From approximately March 27, 2018, to April 17, 2018, GHORBANI was in Iran. Upon his return to Los Angeles, California, on or about April 17, 2018, a physical search of GHORBANI's luggage revealed within GHORBANI's pockets several hand-written notes, which contained a phone number under the name "Omid (note: or Amir) Topol" ("topol" means a bit overweight, which is descriptive of DOOSTDAR) and DOOSTDAR's Iran-based mobile number, XXXXXXXX0316 [redacted].

47. On or about April 17, 2018, when he entered the United States from Iran, GHORBANI also had a document that appears to contain taskings for the future collection of information about the MEK. The document was titled "About the organization" and included:

- More influence in order to find out secret information, people in the network and organization's decisions against Islamic Republic;
- Attending the monthly gathering every last Sunday of the month at the church;
- Evaluation of the work place's independency and the possibility of using it for the gathering of the important people of the organization; and
- Introducing a second person who can be trained by uncle Sohrab and can act like uncle Sohrab inside the organization.

14

*GHORBANI's Surveillance of MEK in May 2018 in Washington D.C.*

48.　　On or about April 23, 2018, according to court-authorized electronic surveillance, a known anti-Iranian regime dissident invited GHORBANI to attend an MEK rally in Washington, D.C. When GHORBANI expressed concerns about the timeframe of the travel, the dissident began talking to GHORBANI about traveling to Paris instead. Later that same day, according to court-authorized electronic surveillance of GHORBANI's mobile phone, GHORBANI received additional calls about attending the MEK rally, including one in which an unidentified male offered to book a flight for him to Washington, D.C.

49.　　The 2018 Iran Freedom Convention for Human Rights was held at the Grand Hyatt hotel in Washington, D.C., on or about May 5, 2018. The convention was organized by the Organization of Iranian American Communities (OIAC), which is supportive of the MEK, and featured speakers who are members and supporters of the MEK. The convention featured Iranians who support a free and democratic Iran consistent with the ten-point plan of Maryam Rajavi, President-elect of the NCRI. Rajavi spoke to the convention via a video message.

50.　　According to FBI physical surveillance, on or about May 4, 2018, GHORBANI flew from Los Angeles, California, to the Baltimore-Washington International Airport (BWI). GHORBANI arrived at BWI on May 5, 2018, with approximately 30 other individuals from California. They boarded a charter bus and drove to the Virginian Hotel in Arlington, Virginia. Later that day, from approximately 11:51 a.m. to 5:55 p.m., GHORBANI attended the convention at the Grand Hyatt hotel in Washington, D.C.

51.　　OIAC uploaded a video to YouTube on or about May 6, 2018, of Rudy Giuliani's speech at the convention. The video featured occasional cuts toward the crowd, and in several instances, GHORBANI can be seen sitting among the California delegation. In every instance,

15

he can be seen lifting up his smartphone and pointing its lens at the speech, speaker, and/or attendees.

52.    According to FBI physical surveillance, on or about May 5, 2018, after the convention, GHORBANI and a group of convention attendees walked to the White House where they took several pictures of each other. GHORBANI then returned to the hotel, where he stayed the night with the rest of the group from California. The next morning, on or about May 6, 2018, GHORBANI traveled back to California.

*DOOSTDAR's Subsequent Conversation with GHORBANI*

53.    On or about May 14, 2018, according to court-authorized electronic surveillance, DOOSTDAR, using his Iranian mobile phone XXXXXXXX0316, called GHORBANI. During the call, DOOSTDAR asked GHORBANI to send unidentified information with someone he trusts and stressed that GHORBANI should not mail it. GHORBANI responded that he was not able to and asked DOOSTDAR if they could discuss it now. DOOSTDAR refused to do so on an open line.

*DOOSTDAR's July 2018 Travel to the United States*

54.    On or about July 19, 2018, DOOSTDAR arrived in Chicago, Illinois, from Tehran, Iran, carrying approximately $16,000 in cash and several electronic items.

55.    Based on my training and experience, I believe that DOOSTDAR's presence in the United States is, in part, for the purpose of collecting the surveillance information from the Washington, D.C. MEK rally from GHORBANI.

56.    Based on my training and experience, and in light of all of the information described herein, I believe that DOOSTDAR and GHORBANI are acting as agents of the Government of Iran and providing services to Iran. DOOSTDAR and GHORBANI are

conducting covert surveillance of and collecting information about the MEK and Israeli/Jewish interests in the United States; the Government of Iran maintains a hostile stance toward the MEK and toward Israeli/Jewish interests across the globe. DOOSTDAR has travelled into the United States from Iran on three occasions to facilitate the collection of this information. While in the United States, I have observed DOOSTDAR engage in intelligence tradecraft and counter-surveillance measures that I assess are consistent with having received training from an Iranian intelligence service. I have also observed DOOSTDAR engage in meetings with GHORBANI that I recognized based on my training and experience to be "source handling" meetings where DOOSTDAR has tasked GHORBANI with collecting intelligence information on MEK, instructed GHORBANI on how to package that information for provision to the Government of Iran, and paid GHORBANI with money that he has brought into the United States from Iran. On at least one occasion, DOOSTDAR has returned to Iran in possession of intelligence information that GHORBANI collected about the MEK. GHORBANI also travelled to Iran in order to brief what I assess to be members of the Government of Iran about information he has collected on the MEK. When GHORBANI returned to the United States from this trip, he was in possession of what I believe, based on my training and experience, to be taskings for the collection of additional information about the MEK.

<u>Conclusion</u>

57.    Based on my training, experience, and familiarity with this investigation, including the Iranian government's aggression toward MEK and Israeli/Jewish interests, I submit that there is probable cause to believe that DOOSTDAR, GHORBANI, and others known and unknown to the United States, are acting on behalf of the Iranian government to gather information that could be used to identify and locate individuals and facilities. I therefore submit that there is probable cause to believe that DOOSTDAR, GHORBANI, and others known and unknown to the United States, conspired to (1) willfully and knowingly act as agents of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, and (2) provide services to Iran, without having first obtained the required license from OFAC, as required by law, in violation of Title 18, United States Code, Sections 371 and 951, and Title 50, United States Code, Sections 1701 et seq.


        FURTHER AFFIANT SAYETH NOT.


                                        (signed telephonically)
                                        _____
                                        MIKEL WIER
                                        Special Agent
                                        Federal Bureau of Investigation

                                08 - 08 - 18

        SUBSCRIBED AND SWORN on August _____, 2018

U.S. District and Bankruptcy Courts
for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk
By____James Scott____
        Deputy Clerk

                                        _____
                                        G. MICHAEL HARVEY
                                        United States Magistrate Judge


18